**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| SABRINA LLOYD-ADAMS, *individually and as* ADMINISTRATOR OF THE ESTATE OF TIMOTHY CODY ADAMS, : : : : : | |
| Plaintiff, : : | |
| v. : : | CASE NO.: 7:24-CV-00137 (WLS) |
| ROBERT KELSCH and KYLE STEPHENSON, : : : | |
| Defendants. : : | |

## **OPINION**

This case arises from a tragic, law-enforcement shooting of a reportedly suicidal man: Timothy Adams. When deputies attempted to detain Adams at his home, a scuffle ensued, during which he drew a pistol on the deputies. In response, they fatally shot him.

Defendants move to dismiss the lawsuit and move for a hearing on their Motion to Dismiss. (*See* Docs. 8 & 11). After review, the Motion to Dismiss (Doc. 8) is granted in part, and denied in part. The Motion for Hearing (Doc. 11) is denied. Upon the allegations and this record, Plaintiff cannot show that Defendants' use of deadly force was unreasonable. So no Fourth Amendment violation occurred. And the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. Thus, the lawsuit is dismissed.

**I.   RELEVANT PROCEDURAL BACKGROUND**

Plaintiff Sabrina Lloyd-Adams sued two Lowndes County Sheriff's Office Deputies in December 2024. (*See generally* Doc. 1). Earlier this year, Defendants filed the Motion to Dismiss (Doc. 8), the Motion for Hearing (Doc. 11), and a Motion to Stay Discovery (Doc. 10). Plaintiff timely responded to the Motion to Dismiss and Defendants timely replied. (Docs. 12 & 14). The Court stayed discovery until it could resolve the Motion to Dismiss. (Doc. 13 at 1–2).

While the Motion to Dismiss was pending, the Supreme Court decided *Barnes v. Felix*, 604 U.S. ----, 145 S. Ct. 1353 (2025). The Court ordered the Parties to submit supplemental briefs addressing *Barnes*'s impact. (Doc. 16 at 1). The Parties timely did so. (Docs. 17 & 18). Because the Motion to Dismiss and Motion for Hearing are fully briefed, they are ripe for ruling.

## II. MOTION TO DISMISS

Defendants move under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiff's Complaint (Doc. 1). After discussing the standard of review and the allegations, the Court considers Defendants' arguments in turn.

### A. Standard of Review

*1. Rule 12(b)(6) Standard*

Fed. R. Civ. P. 12(b)(6) permits a party to move to dismiss a claim if a complaint fails to state a claim upon which relief can be granted. The Court should not grant a Rule 12(b)(6) motion to dismiss unless a plaintiff fails to plead enough facts to state a claim for relief that is plausible, and not merely conceivable, on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[I]f the factual allegations are not 'enough to raise a right to relief above the speculative level[,]'" the Court should dismiss the complaint. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). In other words, the allegations "must possess enough heft to set forth a plausible entitlement to relief." *Id.* (quotation marks omitted).

The Court conducts its analysis "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). The Court "make[s] reasonable inferences in plaintiff's favor, but [need not] draw plaintiff's inference." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (quotation marks and citation omitted), *abrogated on other grounds by Mohamad v. Pal. Auth.*, 566 U.S. 449 (2012). Even though the Court accepts all allegations in a complaint as true, this principle "is inapplicable to legal conclusions," which "must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

*2. Extrinsic Documents*

Defendants ask the Court to consider exhibits attached to their Motion. (*See generally* Doc. 8-1). Plaintiff objects. (Doc. 12 at 6). Ordinarily, the Court may not consider

materials beyond the complaint on a motion to dismiss without converting it into a motion for summary judgment. *Speaker v. U.S. Dep't of Health & Hum. Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010) (citing Fed. R. Civ. P. 12(d)). But if the Court converts a motion to dismiss into one for summary judgment it should afford Plaintiff "a reasonable opportunity . . . to present all [relevant] evidence[.]" *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024) (citing Fed. R. Civ. P. 12(d)). This "conversion" rule yields in two contexts: (1) incorporation by reference and (2) judicial notice. *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). Defendants argue that these exceptions apply to their attached exhibits. For the body camera footage, the Court agrees. For the state-court filings, the Court does not.

### a. Body Camera Footage

Defendants submit—relying on incorporation by reference—body camera footage from the day of the shooting. (Docs. 8-4 & 8-5).[1] The Court considers this footage. The incorporation-by-reference doctrine permits the Court to consider a document attached to a motion to dismiss if that document is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson*, 107 F.4th at 1302. A document may be incorporated by reference even if the complaint does not actually refer to or attach the document. *Id.* This doctrine affords the Court substantial discretion to consider, or not consider, a document. *See Jackson v. City of Atlanta*, 97 F.4th 1343, 1350 (11th Cir. 2024). Even so, the Eleventh Circuit has unwaveringly affirmed district courts that consider police-body-camera footage on motions to dismiss excessive force lawsuits. *See id.*; *Baker*, 67 F.4th at 1277; *Johnson*, 107 F.4th at 1300–01; *Swinford v. Santos*, 121 F.4th 179, 187–88 (11th Cir. 2024).

The body camera footage satisfies the incorporation-by-reference requirements easily. The footage depicts the events leading up to Defendants' contact with Adams, the scuffle leading to the use of force, and the fatal shooting. (*See* Doc. 8-4 at 0:30–4:40); (Doc. 8-5 at 6:30–11:30). In other words, the events central to Plaintiff's claims. (*Id.*) And Plaintiff does not dispute the

---

[1] These videos are referenced as exhibits attached to Defendants' Motion to Dismiss. Defendants contemporaneously filed the videos with the Court. Defendants' Exhibit C (Doc. 8-4) refers to Defendant Kelsch's body camera footage. Defendants' Exhibit D (Doc. 8-5) refers to Defendant Stephenson's body camera footage.

3

footage's authenticity. (*See* Doc. 12 at 4). Hence the Court may properly consider the footage and Plaintiff's objection to it is overruled.

Nevertheless, Plaintiff protests that if the Court considers the body camera footage it would be making factual determinations reserved for the jury. (Doc. 12 at 5). Yet the Court does not find facts from the footage. Instead, the Court credits Plaintiff's allegations as true but only to the extent that the footage does not plainly contradict those allegations. *See Baker*, 67 F.4th at 1277. Where the footage is ambiguous, the Court "must construe all ambiguities" in Plaintiff's favor. *Jackson*, 97 F.4th at 1350 (quoting *Baker*, 67 F.4th at 1277). But where the "video is clear and obviously contradicts" the allegations, the Court credits the video's depiction over the Complaint's account "and view[s] the facts in the light depicted by the video." *Baker*, 67 F.4th at 1277–78 (citation omitted) (citing *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) and *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

At times, the Court credits the footage over the allegations. The footage is crisp, uninterrupted, and shows a second-by-second account of the relevant events. (*See generally* Doc. 8-4 & 8-5). It is highly detailed and unambiguous. (*Id.*) And the footage clearly contradicts some allegations. For example, the Complaint alleges that Stephenson had his gun drawn before he grabbed Adams's wrist. (Doc. 1 ¶ 23). Yet Kelsch's body camera, which had a clear view of Adams and Stephenson, shows that Stephenson drew his gun only after Adams began to rise. (Doc. 8-4 at 3:18–21). Indeed, the Complaint, at best, is hazy about details and highly argumentative. (*See generally* Doc. 1). To the extent possible, the Court relies on the allegations. Still, when the body camera footage provides crucial details that the Complaint omits or misstates, the footage controls.

### b. State-Court Filings

Defendants also submit—relying on judicial notice—certified copies of Plaintiff's state-court filings in a related case. (Doc. 8-2 & 8-3). The Lowndes County Superior Court filings have attachments: an Investigative Summary (Doc. 8-2 at 13) and several grainy screenshots (Doc. 8-3 at 14–19) of body camera footage.

To be sure, the Court may judicially notice certain facts on a motion to dismiss. *Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)). This includes certified documents filed in a different case. *U.S.*

4

*ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811–12 (11th Cir. 2015). The scope of judicial notice of court documents, however, is limited. The Court may not judicially notice court documents for the truth of the matters asserted. *See United States v. Jones*, 29 F.3d 1549, 1553–54 (11th Cir. 1994). Rather, the Court may notice those documents only for the limited purpose of recognizing the record's existence and the record's content, and the fact of that litigation. *See Bryant*, 187 F.3d at 1277–78.

Because Defendants ask the Court to judicially notice the state-court filings for the truth of the matters asserted, the Court declines. By illustration, Defendants cite the state-court complaints and the attached investigative summary to establish the circumstances of the 911 dispatch which led to Adams's death. (Doc. 8-1 at 2). That is, Defendants use the state-court filings to establish substantive facts asserted in those filings. This exceeds the limited scope of judicial notice of court documents. Plaintiff's objection to the state-court filings (Docs. 8-2 & 8-3) is thus sustained.[2]

**B. The Allegations**

With these principles in mind, the Court turns to the allegations—as tempered by the body camera footage. Adams was a U.S. Airforce Staff Sergeant with depression, anxiety, and Post Traumatic Stress Disorder. (Doc. 1 ¶ 1). In June 2022, Plaintiff, Adams's wife, grew concerned that her husband was suicidal. (*Id.* ¶ 2). At an Airforce supervisor's suggestion, Plaintiff called a suicide-crisis helpline. (*Id.* ¶¶ 4, 6). The helpline dispatched two crisis counselors—but called 911 as well. (Doc. 1 ¶¶ 7, 8). Dispatchers sent uniformed Lowndes County Sheriff's Deputies—including Kelsch and Stephenson—to the Adams' home. (*Id.* ¶ 8). Plaintiff was dismayed to learn this because Adams had a previous, "danger[ous]" encounter with Lowndes County Deputies. (*Id.* ¶ 10).

Stephenson arrived first. (Doc. 8-5 at 6:22). The crisis counselors met him on the suburban road in front of the Adams' house. (*Id.* at 6:22–30). Stephenson and the counselors then walked onto the Adams' driveway and greeted Plaintiff. (*Id.* at 7:15–31). She explained that Adams was sleeping on the back porch of their house with a gun tucked into his

---

[2] To the extent Defendants asks the Court to consider the state-court filings for the fact of the Lowndes County litigation and its subject matter, the Court likewise declines. For those purposes, the state-court filings are irrelevant.

5

waistband. (*Id.* at 7:25–51); (Doc. 1 ¶ 14). While Stephenson spoke to Plaintiff, Kelsch and a sergeant arrived. (Doc. 8-4 at 0:12–20). Stephenson then walked away from Plaintiff to confer with the other deputies and a crisis counselor. (*Id.* at 1:45). Although the crisis counselor explained that Plaintiff would prefer Air Force personnel to speak with Adams first, the sergeant dismissed the request. (Doc. 8-5 at 8:29–35); (Doc. 1 ¶ 11).

The sergeant then made a plan: Kelsch and Stephenson would walk through the house to contact Adams. (Doc. 8-5 at 8:28–32); (Doc. 1 ¶ 14). So Kelsch and Stephenson entered and walked through to the back door. (Doc. 1 ¶ 15); (Doc. 8-4 at 2:11–46). When Stephenson peered through the back door, he saw Adams sleeping on a chair outside. (Doc. 1 ¶ 16); (Doc. 8-5 at 10:14–31). Stephenson then furtively opened the back door and quietly walked through toward Adams, without announcing his presence. (Doc. 1 ¶ 21); (Doc. 8-4 at 2:59–3:16). Kelsch followed. (*Id.*)

As Stephenson approached Adams, the encounter devolved quickly. (Doc. 1 ¶¶ 22–26); (Doc. 8-4 at 3:16–24). Stephenson reached out his hand to grab Adams's arm while Stephenson's other hand reached for his own gun. (*Id.* at 3:19–22). Just before the two made contact, Adams startled awake. (Doc. 1 ¶ 23); (Doc. 8-5 at 11:04–07). Clearly disoriented, Adams opened his eyes and tried to wrest his hand out of Stephenson's grip. (Doc. 1 ¶ 23); (Doc. 8-5 at 11:05–08). As Stephenson grappled for control, he drew his own gun. (Doc. 1 ¶ 23); (Doc. 8-4 at 3:19–22).

Adams began to rise out of the chair. (Doc. 1 ¶ 23); (Doc. 8-5 at 11:04–11). He then ripped his right arm free and reached for his own gun in his waistband. (Doc. 8-5 at 11:05–10). At the same time, Stephenson yelled "don't, don't" and shot Adams. (Doc. 1 ¶ 24); (Doc. 8-5 at 11:08–10). After Stephenson fired the first shot, Kelsch came up beside Adams and shoved him into the back yard. (Doc. 1 ¶ 25); (Doc. 8-5 at 11:09–11). While falling to the ground, Adams finished pulling his pistol out. (Doc. 8-5 at 11:09–11). Stephenson then shot Adams several more times. (Doc. 1 ¶ 27); (Doc. 8-5 at 11:10–12). Kelsch shot Adams once. (Doc. 1 ¶ 27) (Doc. 8-4 at 3:25–26). After these shots, Adams slumped over and never moved again. (Doc. 1 ¶ 28); (Doc. 8-5 at 11:12–16).

**C. Law & Analysis**

   *1. Individual-Capacity Claims*

Turning to the merits, Defendants move to dismiss Plaintiff's individual-capacity claims, asserting qualified immunity. Qualified immunity shields government officials from civil liability to the extent their conduct "does not violate clearly established statutory or constitutional rights" about which a reasonable official would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine balances two key interests: "(1) the need to hold public officials accountable when they exercise power irresponsibly and (2) the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (enumeration added). If an officer asserts qualified immunity on a motion to dismiss, a court must address it. *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1332–34 (11th Cir. 2025) (citing *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018)).

   **a.   Discretionary Authority**

At the first step, an official must establish that he performed a discretionary function when the alleged constitutional violation occurred. *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (quotation marks omitted). A discretionary function is "a legitimate job-related function (that is, pursuing a job-related goal)" pursued through means that were within an official's power to employ. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265–66 (11th Cir. 2004) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1185 n.14 (11th Cir. 1994)). Generally, "[i]nvestigating crimes, conducting searches, and making arrests are legitimate job-related functions" for police officers. *West v. Adams*, No. 1:19-CV-219, 2021 WL 4505612, at *3 (M.D. Ga. Sept. 30, 2021) (alteration in original) (quoting *Mears v. McCulley*, 881 F. Supp. 2d 1305, 1318–19 (N.D. Ala. 2012)); *see also Grider v. City of Auburn*, 618 F.3d 1240, 1267–68 (11th Cir. 2010); *Carter v. Butts Cnty.*, 821 F.3d 1310, 1317–19 (11th Cir. 2016).

As alleged, Defendants performed a discretionary function when they violated Plaintiff's constitutional rights. Plaintiff sues for Defendants' actions when they investigated, detained, and shot an armed and potentially suicidal man. (*See generally* Doc. 1). Investigating and detaining Adams is, of course, related to Defendants' duties as sheriff's deputies. And the force they used was, but for the alleged constitutional violation, within the power of a police

officer to employ. So when the alleged violation occurred, Defendants were acting within their discretionary authority.

### b.  Qualified Immunity

At the second step, the burden now shifts to Plaintiff to defeat qualified immunity. *See Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (citing *Mikko v. City of Atlanta*, 857 F.3d 1136, 1319 (11th Cir. 2017)). To do so, Plaintiff must meet two requirements. *See Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199–1200 (11th Cir. 2007)). First, Plaintiff must sufficiently allege a constitutional violation. *Echols*, 913 F.3d at 1319 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Second, Plaintiff must show that her violated right was "clearly established at the time[.]" *Id.* (quotation marks omitted) (quoting *al-Kidd*, 563 U.S. at 735). Plaintiff cannot show a constitutional violation here.

Plaintiff claims Defendants, when they fatally shot Adams, violated his Fourth Amendment right to be free from excessive force. (Doc. 1 ¶¶ 40–57). The Fourth Amendment's protection against unreasonable seizures includes the right to be free from the use of excessive force. *See Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Naturally, the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat . . . to effect it." *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010) (citing *Graham*, 490 U.S. at 396). Yet the amount of force used must be "objectively reasonable . . . from the perspective of a reasonable officer on the scene." *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018) (quotation marks omitted). Still, courts must not evaluate an officer's actions with "the 20/20 vision of hindsight" because officers act "in tense, uncertain, and rapidly evolving situations." *Id.* (quotation marks omitted).

When the Parties initially briefed the Motion, the Eleventh Circuit's rule for analyzing deadly-force cases controlled. *See Harris-Billups ex rel. Harris v. Anderson*, 61 F.4th 1298, 1302 (11th Cir. 2023) (citing *Powell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022)). Then, deadly force was reasonable if an officer "ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others[.]" *Id.* (quoting *Powell*, 25 F.4th at 922). This narrowed the inquiry to whether the suspect "posed a lethal threat" when the officer

8

used the deadly force. *Id.* The Eleventh Circuit did not name its deadly-force rule. *See Powell*, 25 F.4th at 922. But, in this Court's view, it was effectively the same as (or sufficiently similar to) the Fifth Circuit's moment-of-threat test, which confined the excessive-force inquiry to whether "the officer or other persons were in danger at the moment of the threat that resulted in the officers' use of deadly force." *See Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020) (alterations omitted).

Both Parties overlooked the Eleventh Circuit's deadly-force rule. (*See generally* Docs. 8, 12 & 14). So the initial briefs failed to engage with the then-governing standard. (*Id.*) But in the meantime, the Supreme Court decided *Barnes v. Felix*, 145 S. Ct. 1353 (2025). *Barnes* rejected the Fifth Circuit's "moment-of-threat" test, because it conflicted with the proper, totality-of-the-circumstances inquiry. *Id.* That inquiry "has no time limit." *Id.* And it requires careful attention to those facts and circumstances of an incident then known to the officer. *Id.* (quoting *Graham*, 490 U.S. at 396).

*Barnes*'s rejection of the moment-of-threat rule calls the Eleventh Circuit's current deadly-force rule into question. Of course, the Court is bound by Circuit precedent. But an intervening Supreme Court decision abrogates prior, circuit precedent if it is "clearly on point" and "clearly contrary" to the prior precedent. *United States v. Dubois*, 139 F.4th 887, 892 (11th Cir. 2025). Hence, in this Court's view, the Eleventh Circuit's pre-*Barnes* rule no longer controls. *See Harris-Billups*, 61 F.4th at 1302; *Powell*, 25 F.4th at 922. Although *Barnes* never mentioned the Eleventh Circuit's approach, its reasoning is clearly contrary to that approach and decided in similar circumstances. *See id.* at 1357–1360. The Eleventh Circuit narrowed the inquiry to the threat the suspect posed at the moment of the deadly force. *Harris-Billups*, 61 F.4th at 1302. But this necessarily imposes a time limit on the deadly-force inquiry, and the Supreme Court has rejected such approaches as inconsistent with its authority. So *Barnes* requires the Court to expand its inquiry beyond the narrow bounds of the Eleventh Circuit's recent, deadly-force authority.

Under the Supreme Court's totality-of-the-circumstances approach, there is no "easy-to-apply legal test" or "on/off switch." *Barnes*, 145 S. Ct. at 1353. Instead, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against" the importance of the governmental interests at stake. *Tennessee. v. Garner*, 471 U.S. 1,

9

7 (1985). This requires balancing factors such as: "the severity of the crime at issue," the level of threat a suspect poses, and if that suspect is "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The officer's actions are also relevant, including efforts to limit the use of force, give warnings, or otherwise try to control the encounter. *Barnes*, 145 S. Ct. at 1358; *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Considering the totality of the circumstances, no Fourth Amendment violation occurred. While the deputies fired, Adams was either drawing, or had drawn, his gun. The Complaint is silent on this point, and Plaintiff disputes this characterization. (*See* Doc. 12 at 12). Yet the body camera footage reflects that Adams reached for his gun before Stephenson fired the first shot. As Adams rose from his chair, he ripped his right arm free from Stephenson's grip. (Doc. 8-5 at 11:05–10). Stephenson's body camera shows that Adams's palm grasped toward the back of his waistband. (*Id.* at 11:08–10). When Stephenson fired the first shot, Adams had reached his gun and was drawing it. (*Id.* at 11:08–11). As Adams fell, he completed the motion. (*Id.* at 11:09–12). So he hit the ground on his back with his gun in his hand. (*Id.*) Defendants then fired more shots while yelling at him to "drop the gun." (*Id.* at 11:10–15). All told, the body camera footage clearly and obviously reveals that at all times when Defendants were using deadly force, Adams was reaching for his gun, or had the gun in his hand. This immediate, deadly threat weighs heavily in favor of Defendants' use of force.

But even before the moment of threat, Defendants knew Adams might be dangerous. When they arrived, Defendants knew "that [Adams] was experiencing a mental health crisis." (Doc. 1 ¶ 14). They also knew of previous confrontations between Lowndes County Deputies and Adams. (*Id.* ¶ 10). Indeed, one of the crisis counselors explained to Defendants, just before they encountered Adams, that his previous contacts with deputies had been "terrible." (Doc. 8-4 at 0:57–1:11).

What's more, Defendants knew Adams had immediate access to a gun. When a suspect is armed, an officer may reasonably believe that a suspect poses a risk of immediate, serious harm. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1169 (11th Cir. 2009). Plaintiff warned Stephenson that Adams had a gun tucked into his waistband. (Doc. 8-5 at 7:44–52). According to the Complaint, Adams's gun enters the narrative only after Stephenson shot Adams— suggesting that Defendants did not know Adams was armed. (*See* Doc. 1 ¶ 26). But the body

10

camera footage clearly and obviously contradicts that account. In the footage, Plaintiff warned Stephenson that Adams had ready access to a gun, and she even identified its location. (Doc. 8-5 at 7:44–52). Stephenson then passed this information to the sergeant who told Kelsch. (*Id.* at 8:45–52). Such ready access to a gun supports a reasonable conclusion that Adams posed a deadly threat.

So, not only did Adams attempt and ultimately draw a gun, but Defendants also knew that he was experiencing a mental health crisis, had previous, dangerous interactions with deputies, and had immediate access to a gun. Even looking beyond the moment that Defendants fired, these circumstances are sufficient to show that their actions were reasonable. Hence, upon the allegations and this record, no Fourth Amendment violation occurred.[3]

To be sure, the deputies' tactics did not remove the possibility of a deadly altercation entirely. The results were tragic. For example, deputies dismissed the request of the trained, crisis counselors for Adams's squadron commander to contact him first. (Doc. 1 ¶ 2); (Doc. 8-5 at 8:25–35). Instead, Defendants startled Adams awake and grabbed him without warning. (*Id.*) Adams's response was violent and arguably, predictably so. (*Id.*) Still, Plaintiff cannot show "a Fourth Amendment violation based merely on [imperfect] tactics that result in" an avoidable, deadly confrontation. *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 616 (2015). And the Eleventh Circuit has found no constitutional violation when officers confronted an armed, suicidal man with guns drawn, shouting commands, while bashing in the windows of his car. *See Garczynski*, 573 F.3d at 1168–1170. Defendants acted considerably less aggressively here. Of course, hindsight reveals that different tactics might have avoided the deadly confrontation. But this does not overcome the conclusion that, considering the totality of the circumstances, Defendants acted reasonably.

Consequently, Defendants are entitled to qualified immunity because Plaintiff cannot show a constitutional violation. Plaintiff's individual-capacity § 1983 claims thus fail. Those claims are dismissed with prejudice.

---

[3] Because there is no constitutional violation, the Court need not discuss the Parties' clearly established law contentions.

11

*2. Official-Capacity Claims*

Defendants also move to dismiss Plaintiff's official-capacity claims—to the extent alleged. (Doc. 12 at 4). Plaintiff, however, responds that she does not assert any official-capacity claims. (Doc. 12 at 4). Defendants' understandable confusion flows from the Complaint, which does not distinguish between Defendants in their official and individual capacities. (Doc. 1 at 1). In any event, even if the Complaint could be construed as alleging official-capacity claims, Plaintiff has explicitly abandoned them. (*See* Doc. 12 at 4). Thus, Plaintiff's official-capacity claims, to the extent alleged, are dismissed with prejudice.

*3. State-law Claims*

Lastly, Defendants move to dismiss Plaintiff's state-law claims. Because the Court declines to exercise supplemental jurisdiction over those claims, it doesn't reach their merits.

District courts have original jurisdiction over claims arising under federal law. 28 U.S.C. § 1331. So the Court has original jurisdiction over Plaintiff's federal claims. Over state-law claims, the Court may exercise supplemental jurisdiction if those claims are "so related" to the original-jurisdiction claims "that they form part of the same case or controversy[.]" 28 U.S.C. § 1367(a). The Court, however, may decline to exercise supplemental jurisdiction if it has dismissed all original-jurisdiction claims. 28 U.S.C. § 1367(c)(3). If so, the Court considers "judicial economy, convenience, fairness, and comity" to determine if it should exercise supplemental jurisdiction. *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002). Allowing state courts to resolve state-law claims, serves both comity and judicial economy. *Id.* This principle carries particular force when federal-law claims have been dismissed prior to trial. *Id.*

The Court has dismissed Plaintiff's § 1983 claim—its source of original jurisdiction. Considering judicial economy, fairness, and comity, the Court declines supplemental jurisdiction over the state-law claims. Therefore, those claims are dismissed without prejudice. Because the Court does not reach the state-law claims' merits, Defendants' motion to dismiss those claims is denied, as moot.

### III. MOTION FOR HEARING

Defendants also move for a hearing. (Doc. 11 at 1). The Court is not required to hold an oral hearing on a motion to dismiss. *See Roberts v. FNB S. of Alma*, 716 F. App'x 854, 857

(11th Cir. 2017) (citing *Greene v. WCI Holdings Corp.*, 136 F.3d 313, 316 (2d Cir. 1998)). Nor does the Court find one necessary. Defendants have offered no particularized reasons for a hearing beyond generalized "complexity of the issues[.]" (Doc. 11 at 1). And the Court's resolution of the Motion to Dismiss above reveals that it is not as complex as Defendants assert. The Motion for Hearing (Doc. 11) is thus denied.

### IV. CONCLUSION

To sum up, Plaintiff cannot show a Fourth Amendment violation because Defendants' deadly force was reasonable upon the allegations and this record. Qualified immunity thus bars Plaintiff's individual-capacity § 1983 claims. To the extent alleged, Plaintiff abandons any official capacity claims. And the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

Hence Defendants' Motion to Dismiss (Doc. 8) is **GRANTED**, in part, and **DENIED**, in part (as moot). Defendants' Motion for Hearing (Doc. 11) is **DENIED**. Plaintiff's claims under 42 U.S.C. § 1983 are **DISMISSED**, with prejudice. Her state-law claims are **DISMISSED**, without prejudice because the Court declines to exercise supplemental jurisdiction over those claims. The lawsuit is thus **DISMISSED**.

**SO ORDERED**, this 14th day of July 2025.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATESDISTRICT COURT**